[Cite as *Cleveland v. Kirkpatrick*, 2011-Ohio-2257.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 94950

---

## CITY OF CLEVELAND

PLAINTIFF-APPELLEE

vs.

## HOLLY KIRKPATRICK

DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cleveland Municipal Court
Case No. 2008 CRB 032004

**BEFORE:** Jones, J., Stewart, P.J., and Sweeney, J.

**RELEASED AND JOURNALIZED:** May 12, 2011

FOR APPELLANT

John H. Lawson
Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103


ATTORNEYS FOR APPELLEE

William D. Mason
Cuyahoga County Prosecutor

BY: Shannon Millard
        Bridget E. Hopp
Assistant Prosecuting Attorneys
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, J.:

{¶ 1}   Defendant-appellant, Holly Kirkpatrick ("Kirkpatrick"), appeals her conviction for endangering children.   Finding no merit to the appeal, we affirm.

Procedural History and Facts

{¶ 2}   In September 2008, the city of Cleveland ("City") charged Kirkpatrick in Cleveland Municipal Court with endangering children.   The matter proceeded to a jury trial, at which the following evidence was adduced.

{¶ 3} At 3:00 p.m. on August 1, 2008, Ebony Bridges dropped off her seven-month-old baby boy at Brightside Academy Daycare Center in Cleveland. Bridges forgot to sign the baby in, which she was supposed to do anytime she brought the child into the daycare. The baby was assigned to Infant Room 2 and had a crib with his name on it.

{¶ 4} At the time, Brightside employed Kirkpatrick as the center's director. The center closed every day at 6:30 p.m. On August 1, Kirkpatrick and the assistant director, Tanika White ("White"), were in charge of closing the center. At 6:30 p.m. there were still ten children at the center, five of whom belonged to staff. White brought all the children into the office and Kirkpatrick began to call the children's parents to find out why the children had not yet been picked up. Bridges's baby was not part of this group.

{¶ 5} As part of closing the center, the employees were to "sweep the hall [and] go in the room [and] check everywhere possible that a child may hide." Employees were to check every crib, cabinets, bathrooms, and the staff lounge. The closing procedure was to be conducted by two staff people every night and the employees checked each room three times.

{¶ 6} White testified that she checked "down the hall" and Kirkpatrick checked "up the hall." White testified that Kirkpatrick was the last person to check Infant Room 2. Kirkpatrick testified that she knew Bridges had not properly signed the baby in and admitted she knew the baby was there that day because his teacher told her at 6:00 p.m. that he had not been picked up.

{¶ 7}  Kirkpatrick testified that she called the baby's aunt, who told her that the baby's father, Eddie Humphrey, would be there before 6:30 p.m. to pick up the baby.

{¶ 8}  After the last child was picked up, Kirkpatrick and White left Brightside between 7:00 and 7:15 p.m., with the baby still in his crib in Infant Room 2.   Kirkpatrick testified that it was White who had the duty to do the final sweep of the building to check for children and that White went back in the building to do a final sweep, telling Kirkpatrick that it was "all clear."

{¶ 9}  When Bridges returned home from work, she discovered her baby was not there.   She thought the baby's father or another relative was going to pick the baby up at Brightside.   Bridges went to the police station to report her son missing.   Humphrey met her there.   The parents and a police officer drove to Brightside but the center was locked down with steel security doors and the officer was unable to gain entry into the building.   They returned to the police station, where officers tracked down Kirkpatrick's home phone number.

{¶ 10} Officer Richard Delvecchio ("Delvecchio") testified that he called Kirkpatrick around 10:30 p.m., informing her that a child may be trapped inside the building.   He told Kirkpatrick that she needed to immediately return to the center so the police could get into the building.   Officer Delvecchio testified that his understanding from talking with Kirkpatrick was that she would meet him at Brightside and that she would keep her cell phone on her in case police needed to reach her.   Officer Delvecchio returned to Brightside with two other

police officers and the baby's parents. Conversely, Kirkpatrick testified that she had no contact from the Cleveland police that evening.

{¶ 11} White testified that around 12 a.m., Kirkpatrick called her to see if she could return to Brightside because "there may be a child in there." White said she would go to Brightside but when she got into her car, it would not start. White testified that she called Kirkpatrick back to inform her that he car would not start and told Kirkpatrick that she would call Delphine Landrum ("Landrum"), the employee in charge of opening up the center in the mornings. Kirkpatrick testified that she called White and told her to go check the sign-in logbook because Bridges's baby was missing; at that time, Kirkpatrick said she did not think the baby was in the building.

{¶ 12} The police returned to Brightside, but discovered that Kirkpatrick had not arrived to open the center. Officer Delvecchio repeatedly tried to call Kirkpatrick on her cell phone. Kirkpatrick finally answered but immediately hung up on the officer. The police sergeant on the scene also tried to call Kirkpatrick but she hung up on the sergeant too.

{¶ 13} About 11 p.m., the Cleveland police contacted the Euclid police to see if they would send a car to Kirkpatrick's house. Officer Krysiak was dispatched to Kirkpatrick's house. He knocked upon arrival, but she did not answer. The officer left her a note to call Cleveland police. He returned a second time at 1 a.m. Kirkpatrick finally answered the door, in her bathrobe, and told the officer she had sent someone to the child care center.

Officer Krysiak testified that Kirkpatrick did not appear "real intent on going to meet Cleveland whenever they wanted her to go."

{¶ 14} Cleveland police were ultimately able to get in contact with Landrum who let officers into Brightside at 12:30 a.m. Officers found the baby in his crib in Infant Room 2. The baby was standing up, with dried tears and mucus on his face, and his blanket had fallen out of his crib. Witnesses testified that it was cold inside the center. The baby was transported to the hospital and was checked out by a doctor; he did not sustain any physical injuries.

{¶ 15} While the police were at Brightside, the phone rang and Landrum answered. On the other end of the phone was Kirkpatrick, who said "Ms. White?" Landrum answered that it was her, not White. Kirkpatrick screamed and immediately hung up. Kirkpatrick called back and Landrum told her "Ms. Holly, do not hang this phone up. Don't hang the phone up, the police need to speak with you."

{¶ 16} At no time that evening did Kirkpatrick return to the daycare center or inquire about the welfare of the baby.

{¶ 17} Brightside Academy terminated Kirkpatrick and White, who were both charged with endangering children. White entered the municipal court's diversion program and the charges against her were dismissed when she completed the program.

{¶ 18} The jury convicted Kirkpatrick of endangering children and the trial court sentenced her to one day in jail as well as 700 hours of community service and one year of probation.

{¶ 19} Kirkpatrick appeals, raising the following assignments of error for our review:

{¶ 20} "I.   The jury's guilty verdict was against the sufficiency of the evidence and must be overruled in that three elements were not proven beyond a reasonable doubt.

{¶ 21} "II. Appellant was denied her Sixth Amendment right to effective assistance of trial counsel when her trial attorney failed to ask the trial [court] to compel the City of Cleveland to respond to her 'Request for Bill of Particulars.'"

Sufficiency and Manifest Weight of the Evidence

{¶ 22} In the first assignment of error, Kirkpatrick contends that the City failed to present sufficient evidence to sustain the endangering children conviction and her conviction was against the manifest weight of the evidence.

{¶ 23} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus.   In *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court delineated the role of an appellate court presented with a sufficiency of the evidence argument as follows:

{¶ 24} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine

whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. * * * " Id. at paragraph two of the syllabus.

{¶ 25} A manifest weight of the evidence claim requires a different review. The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Brindley*, Franklin App. No. 01AP-926, 2002-Ohio-2425, ¶16. When presented with a challenge to the manifest weight of the evidence, an appellate court, after "'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, supra at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "'exceptional case in which the evidence weighs heavily against the conviction.'" Id.

{¶ 26} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of

sufficiency. *State v. Braxton*, Franklin App. No. 04AP-725, 2005-Ohio-2198, ¶ 15. "[T]hus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Id.

{¶ 27} The jury convicted Kirkpatrick of endangering children, in violation of R.C. 2919.22, which provides in pertinent part:

{¶ 28} "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

{¶ 29} Kirkpatrick claims that the City was unable to show: 1) that she had custody or control over the baby, 2) that she acted recklessly, or 3) that she created a substantial risk to the baby's health or safety. We disagree.

{¶ 30} The evidence presented at trial shows that Kirkpatrick was the director of the daycare and the supervisor in charge on the day the baby was left at the daycare. Both White and Landrum testified that Kirkpatrick was responsible for the children and was a "hands-on" director. Kirkpatrick was the last person who was supposed to check Infant Room 2 and left the building with White that evening. As the director of the daycare who was present and closed the building, Kirkpatrick had custody and control over the child.

{¶ 31} As to whether Kirkpatrick acted recklessly, the City provided sufficient evidence that she acted recklessly by not properly following closing procedures and by

refusing to assist the police officers in gaining access to the daycare center. A person acts recklessly when, with heedless indifference to the consequences, she perversely disregards a known risk that her conduct is likely to cause a certain result or is likely to be of a certain nature. R.C. 2901.22(C). White testified that Kirkpatrick was the last person charged with checking Infant Room 2. Moreover, once Kirkpatrick learned that a child may have been left at Brightside, she did nothing to assist police other than call another employee of the center. She evaded multiple attempts by two police departments to contact her. Once she knew that a child might have been left behind in the daycare center, it was another three hours before police could access the center, even though Kirkpatrick only lived 35 minutes from the center.

{¶ 32} Finally, the city provided sufficient evidence that Kirkpatrick created a substantial risk to the baby's health and safety. A "substantial risk," however, requires only a "strong possibility * * * that a certain result may occur * * *," not that a certain result actually occurred or definitely would occur. R.C. 2901.01(A)(8). Thus, although the baby was not harmed, an actual showing of harm is not required. Certainly, a rational trier of fact could find that Kirkpatrick's behavior created a substantial risk of harm to the baby.

{¶ 33} Therefore, we find the city presented sufficient evidence of endangering children. We further find that the conviction was not against the manifest weight of the evidence. The first assignment of error is overruled.

Effective Assistance of Trial Counsel

{¶ 34} In the second assignment of error, Kirkpatrick alleges that her counsel was ineffective for failing to ask the trial court to compel the city to respond to the bill of particulars.

{¶ 35} To reverse a conviction for ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 2000-Ohio-448, 721 N.E.2d 52, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 36} As to the second element of the test, the defendant must establish "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus; *Strickland* at 686. In evaluating whether a petitioner has been denied effective assistance of counsel, the Ohio Supreme Court held that the test is "whether the accused, under all the circumstances, had a fair trial and substantial justice was done." *State v. Hester* (1976), 45 Ohio St.2d 71, 341 N.E.2d 304, paragraph four of the syllabus.

{¶ 37} This court must presume that a licensed attorney is competent and that the challenged action is the product of sound trial strategy and falls within the wide range of professional assistance. *Strickland* at 689. Courts must generally refrain from second-guessing trial counsel's strategy, even where that strategy is questionable, and

appellate counsel claims that a different strategy would have been more effective. *State v. Jalowiec*, 91 Ohio St.3d 220, 237, 2001-Ohio-26, 744 N.E.2d 163.

{¶ 38} Kirkpatrick claims that if her attorney had motioned the court to compel the city to answer a bill of particulars filed by her previous attorney, the outcome of the trial would have been different because the city relied so heavily on Kirkpatrick's actions after she left the baby in the daycare center. Had the bill of particulars been filed, Kirkpatrick argues her counsel would have been more fully prepared to counter allegations that Kirkpatrick was unresponsive to police inquiries. But a criminal defendant is generally not prejudiced by the state's failure to provide a bill of particulars where the underlying indictment clearly identifies the criminal statute that a defendant is being charged with violating, the exact time frame during which the crimes occurred, and the county or location where the alleged crimes took place. See *State v. Brown* (1993), 90 Ohio App.3d 674, 682, 630 N.E.2d 397. Moreover, by proceeding to trial without a bill of particulars, a defendant waives any claim of error concerning the failure to receive a bill of particulars. *State v. Roy* (Oct. 12, 1995), Cuyahoga App. No. 67462.

{¶ 39} We find that based on the foregoing, Kirkpatrick has not shown to a reasonable degree of probability that but for her counsel's failure to file a motion to compel, the outcome of the trial would have been different. Simply put, defense counsel's performance did not rise to the level of ineffective assistance of counsel.

{¶ 40} Therefore, the second assignment of error is overruled.

Accordingly, judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES,   JUDGE

MELODY J. STEWART, P.J., and
JAMES J. SWEENEY, J., CONCUR